IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86180-8-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| ADAM JUDAH DIGGINS, | |
| Appellant. | |

COBURN, J. — In his first trial, a jury convicted Adam Diggins of felony harassment, cyberstalking, and use of drug paraphernalia after he threatened to kill M.D., his ex-girlfriend's partner, but hung on the charge of attempted murder in the first degree. The State retried that charge twice more resulting in another hung jury, followed by a conviction. Diggins challenges the sufficiency of the evidence supporting his convictions for felony harassment and cyberstalking, including the deadly weapon sentence enhancement as to the cyberstalking conviction. He also argues that the jury was not properly instructed on the definition of a "true threat." As to the third trial, Diggins asserts that the trial court erred in admitting additional evidence not presented in previous trials, he argues the prosecutor committed misconduct in closing and that his counsel was ineffective. Diggins also contends that the trial court erred in imposing discretionary fees following his conviction. Diggins makes several additional claims in a statement of additional grounds. We remand for the trial court to strike the Victim

Penalty Assessment (VPA) and DNA collection fee, but otherwise affirm.

FACTS

Diggins and D.G. were in a relationship for about 15 years, during which they had a daughter, before they separated around 2008. The relationship ended when D.G. decided to stop using drugs, but Diggins was not willing to do so. D.G. subsequently moved to Halfway, Oregon while Diggins remained in Happy Valley, Oregon. Following the end of their relationship, Diggins would make regular attempts to contact D.G. and would occasionally send her money in an attempt to maintain contact.

In 2014, D.G. began dating M.D., who lives in Longview, Washington. In 2015, Diggins threatened to kill M.D. in an effort to discourage M.D. from dating D.G. because Diggins wanted to get back together with her. In response, M.D. began to carry a gun when he visited D.G. D.G. lived with M.D. in Washington state from 2018 to 2019, before returning to her parents' home in Oregon. In March 2021, D.G. moved back into M.D.'s home.

On May 6, 2021, Diggins sent D.G. $700 through Facebook Messenger and continued to send D.G. messages. D.G. told Diggins that she was offered a job at a certain retail chain. Diggins, realizing that the chain did not have a store in Halfway, asked if D.G. was still speaking to M.D. D.G. told Diggins it was none of his business, thanked him for the money, and turned her phone off because the battery was low.

After returning home that evening, D.G. charged her phone and turned it on to find messages from Diggins stating

> "Well today's the day I'm not gonna go alone I am going to take that fuck out with me the one who destroyed my life and defiled my fucking beautiful wife I'm going to kill him and I will never forgive you."

"You betrayed me betrayed our family destroyed everything that was good
For him I can't live with that I hope you understand."

"You better call me and talk some sense into me because I'm Going
straight there now hopefully I'll get killed"

Diggins followed up, stating "I'm in woodland And I'm not stopping you have no capacity to even imagine my passion and that I would truly die for love[.]" This message was accompanied by a photo of a handgun resting on the center console of Diggins' vehicle, near the gearshift. The gun was a Glock 26 9 mm semi-automatic pistol, which had a magazine inserted and appeared to be loaded with ammunition. Another message below the photo stated "I know you think it's another bluff Don't worry this time I'm for real."

D.G. notified M.D. and sent him screenshots of the messages from Diggins. D.G. was "panicked a little" upon receiving the messages and photo. M.D. was at work at the time, and told D.G. to contact police. M.D. worked the night shift and did not get off work until the next morning. When D.G. did not call police, M.D. called the Cowlitz County Sheriff's Office from work. M.D. told D.G. where his handgun was located in the house. Based on the messages, M.D. "believed [Diggins] was coming to the house" and was concerned for his and D.G.'s safety. M.D. was fearful that Diggins would carry out the threat. A deputy arrived at M.D.'s home to speak with D.G. that evening. D.G. was "flustered, emotional, upset" when the deputy arrived. The deputy took photos of the messages before leaving.

D.G. had also received a number of voicemails from Diggins threatening to kill M.D. between May 6 and 7. In them, Diggins stated

- "I'm not exaggerating that. I will go kill that bastard, I'm not exaggerating at all."

3

- "I'm probably going to go up there and probably fucking shoot that guy in the head"

- "And I absolutely am going to kill him, and I'm absolutely going to kill myself. I am absolutely going to do this."

- "I'm serious. This is not going to end well. You know me. You know this could happen."

- "You need to call me because I'm going to be driving all the way there and it's not going to be good once I get there."

- "You know I'm going to escalate, things worse and worse and worse"

In addition to sending messages to D.G., Diggins also sent messages to their daughter, stating in part

- "I know your mom thinks I'm bluffing. You think I'm bluffing? This time I'm not."

- "Once I see him, I won't be able to not shoot, and that will get me shot."

M.D. returned home from work the next morning and located his handgun. M.D. kept the loaded handgun on his nightstand while he slept. When M.D. woke up later that day, D.G. showed him additional messages sent by Diggins that morning. The messages included:

- "[T]ake your fucking meth pills and wake up and call me before I escalate"

- "You need to call me before I start driving back to Longview like I did yesterday I'll start there then halfway I swear to god you need to face this situation you let happen!"

- "Well my phone won't work I'm leaving right now going to make a couple stops but I will see you face-to-face today you can take that to the bank"

- "How could you think that this would not end up any other way? You seriously think I'm stupid and wouldent [sic] figure out everything? You think you could take my money and play my friend and there wouldn't be consequences! Now I know why your [sic] scared of me! Because of your lies and actions! You should be!"

- "These are not little things these lies and deceit these are things that can cost people their lives"

At approximately noon, Diggins sent a message with M.D.'s address. In the same message, Diggins stated "I'll se [sic] ya or [M.D.] in 45" followed by an emoji that appeared to be blowing a kiss.

After viewing the messages, M.D. put his handgun in a holster and loaded a rifle, taking both guns into a bedroom from which he could observe the street and driveway in front of his home. M.D. called police again to notify them of the continuing threats. M.D. was concerned because he did not know that Diggins knew his address before then. M.D. stated that "receiving these threats and knowing that he knows where I live is, you know, disconcerting." D.G. explained that they were both afraid at that point.

Another deputy arrived to the house in a marked patrol car. D.G. told the deputy that Diggins drove a gray Dodge Nitro with Oregon license plates. While the deputy was in M.D.'s home, D.G. received another message from Diggins. Diggins sent a photo of an intersection in M.D.'s neighborhood, a "couple of hundred feet" from his home. The photo was accompanied by a message stating "I'm on the street going to go talk to him."

The deputy told D.G. and M.D. to remain in the home while he responded to Diggins' location in his patrol car. The deputy approached the car with his gun drawn and ordered Diggins to show his hands. Diggins raised his left hand, but his right hand remained in the compartment of the vehicle and not visible to the deputy. The deputy could see Diggins' right shoulder moving around while Diggins leaned toward the passenger side of the vehicle. The deputy again ordered Diggins to show his hands. Diggins complied after several seconds and exited the vehicle. The deputy informed

Diggins that he was there because Diggins had threatened to kill M.D. and D.G. and M.D. was scared. Diggins responded "I did that."

Officers conducted a search of the vehicle and found the handgun under the front passenger seat. Officers found a holster sitting upright at an angle in the center console of the vehicle. In the center of the holster where a gun would be placed, officers found a loaded magazine sitting upright and another loaded magazine in a Velcro pouch attached to the holster.

Diggins was arrested and charged with attempted murder in the first degree, felony harassment, cyberstalking, and use of drug paraphernalia. The court denied bail pending resolution of the charges.[1]

While in custody following his arrest, Diggins used the PIN number[2] of another jail inmate to make a phone call to his daughter. In this phone call, Diggins stated in part

- "The threats that I had made over those three days, and going back for years, never involved only [M.D.] and they always involved killing myself. I made countless claims that I was ready to kill myself."

- "I added [M.D.] to the threats so that she would hopefully care and pick up her phone. The threats always included murder-suicide, or suicide, but never murder alone. I got cold feet and exited, – and never exited the car, because I was not ready to die that day."

- "That's the honest truth. I got cold feet. I wasn't gonna go through with it because I didn't want to die. I didn't want to kill myself. There was no scenario that I was ever going to kill that man and not myself."

---

[1] This decision was the basis of Diggins' personal restraint petition previously decided by the Court of Appeals Division II. See In re Pers. Restraint of Diggins, No. 55987-1-II, slip op (Wash. Ct. Jan. 19, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2055987-1-II%20Unpublished%20Opinion.pdf.

[2] The jail assigns each inmate a unique PIN number they can use to make phone calls from the jail. Records reflect which PIN is used to make each phone call placed by inmates in the jail. Inmates are generally required to use their own PIN to make calls and are not permitted to use PINs belonging to other inmates to place calls.

- "And I have to convince the jury that I wasn't gonna kill that man. And the only thing that I have, the only reason I wasn't is because I wasn't going to kill myself. And I didn't – every single message that I can remember sending was about me killing myself and him along the way."

These jail calls were not discovered by the State until about a month before the third trial began.

### Procedural History

Diggins proceeded to trial in November 2021. Diggins was convicted of felony harassment with a firearm enhancement, cyberstalking – domestic violence with firearm enhancement, and use of drug paraphernalia. The jury was unable to reach a verdict on the attempted murder charge and a mistrial was declared. Diggins was retried on that charge in late May 2022. The jury was again unable to reach a verdict and the trial court declared a mistrial. After the second trial, Diggins renewed his motion for bail. Noting that Diggins had been convicted of two felonies and one misdemeanor, despite the fact that he was awaiting his third trial on a charge of attempted murder, the court denied the request.

Diggins' third trial was held in August 2022. The State did not introduce evidence of Diggins' 2015 threats to M.D. in the first or second trials, but did introduce such evidence in the third trial over Diggins' objection. Diggins' jail phone calls also were admitted in the third trial after the court denied Diggins' motion to exclude them under CrR 8.3(b). The jury found Diggins guilty of attempted murder in the first degree while armed with a firearm. Diggins was subsequently sentenced to a total of 296 months' confinement for the three felony convictions and a 90-day suspended sentence for the misdemeanor conviction.

7

Diggins appeals.  Additional facts are set out below where relevant.

DISCUSSION

Evidentiary Rulings

*A.  2015 Threats*

Diggins first challenges the admission of testimony that he had previously threatened to kill M.D. in 2015.[3]  He contends that the trial court failed to balance the prejudicial effect of the evidence with its probative value on the record as required by ER 404(b).

"Decisions involving evidentiary issues lie largely within the sound discretion of the trial court and ordinarily will not be reversed on appeal absent a showing of abuse of discretion."  State v. Nava, 177 Wn. App. 272, 289, 311 P.3d 83 (2013).  A trial court abuses its discretion when its decision is manifestly unreasonable or is based on untenable grounds or reasons.  State v. Taylor, 193 Wn.2d 691, 697, 444 P.3d 1194 (2019).  ER 404(b) prohibits the introduction of other crimes, wrongs, or acts to prove propensity, but allows for their admission for other purposes, including proof of intent.  Before a trial court may admit such evidence, it must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.  State v. Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).  The trial court is required to conduct this balancing analysis on the record.  State v. Lilliard, 122 Wn. App. 422, 431, 93 P.3d 969 (2004).

---

[3] Review of this issue is limited to the third trial which took place between August 4 and August 5, 2022 in which Diggins was convicted of attempted murder in the first degree.

However, where the trial court fails to conduct balancing on the record, the failure constitutes harmless error when the record is sufficient for the reviewing court to determine that the trial court, had it considered the relative weight of the probative value and prejudice, would still have admitted the evidence. State v. Carleton, 82 Wn. App. 680, 686-87, 919 P.2d 128 (1996).

Here, the State sought to introduce evidence that Diggins had threatened to kill M.D. at some point in 2014 or 2015. Because this was evidence of a prior bad act and not a part of the charged conduct, the trial court was required to engage in an ER 404(b) analysis and weigh the probative value of the evidence against its prejudicial effect on the record. The State argued that the ultimate issue of the trial was Diggins' intent in sending the message – whether he actually intended to kill M.D. The State argued that the evidence was highly probative of the defendant's intent because it showed a long-standing hostility toward M.D. and a continuing intent to kill M.D. between 2015 and the charged incident in 2021. The State argued that the court need not conduct an ER 404(b) analysis because the evidence "isn't really a prior bad act because we're talking about a person's intent"[4] and that Diggins has long held a desire to kill M.D. The State, nonetheless, also argued that the evidence also was admissible to prove motive and intent as an ER 404(b) exception. The State argued the probative value outweighed the prejudicial effect because the jury was going to hear all the messages from Diggins in May 2021 threatening to kill M.D.

Defense argued that the numerous messages sent in 2021 provided sufficient evidence for the State to make an argument regarding Diggins' intent, making the 2015

---

[4] The State no longer maintains this argument on appeal.

9

threats "less probative" of Diggins intent in 2021. Diggins' counsel argued that "the State's trying to say, well, because he made this threat before, he's dangerous and that's why he's likely to commit this crime, which is not allowable."

The trial court ultimately stated,

There are balancing tests, and I think any evidence elicited, especially by the State in a criminal trial, arguably is prejudicial, at least to an extent. And whether it is more prejudicial than probative is for the Court to determine, and then ultimately, the weight to be given to whatever evidence is allowed is for the trial [sic] of fact. And in that situation, that's our jury.
      I've reviewed *Powell*.[5] I'm pretty familiar with the Rules of Evidence, and in this case, I am going to allow the State to use the reference. I think it is probative. I think it may be – and I am a bit with [the prosecutor] on this – I don't know that the balancing act is the same as if it were a 404 exception.
      I think that there's the allowance for some of this testimony, and I think the weight that it's given, because clearly in 2015, we weren't sitting here dealing with this issue. So, I think the weight that is given to that is for the jury to determine.

To prove murder in the second degree in <u>Powell</u>, the Supreme Court held, under an ER 404(b) analysis, that the prior assaults between the defendant and victim were admissible to prove motive, but were not admissible to prove intent because intent was not a disputed issue where an autopsy revealed the cause of death was by manual strangulation. 126 Wn.2d 244, 261-64, 893 P.2d 615 (1995). The court recognized that

Evidence of previous disputes or quarrels between the accused and the deceased is generally admissible in murder cases, particularly where malice or premeditation is at issue. "Such evidence tends to show the relationship of the parties and their feelings one toward the other, and often bears directly upon the state of mind of the accused with consequent bearing upon the question of malice and premeditation."

<u>Powell</u>, 126 Wn.2d at 261-62 (quoting <u>State v. Davis</u>, 6 Wn.2d 696, 705, 108 P.2d 641 (1940), <u>overruled in part on other grounds by</u> <u>State v. Crenshaw</u>, 98 Wn.2d 789, 659

---

[5] <u>State v. Powell</u>, 126 Wn.2d 244, 893 P.2d 615 (1995).

P.2d 488 (1983)).

Though the trial court certainly understood that it had the responsibility to determine whether the evidence was more prejudicial than probative, it failed to actually conduct the balancing test on the record. However, we find that the error was harmless. Though Diggins argued propensity, it was undisputed that Diggins made the threats in May 2021. The State was not introducing the prior threats to prove Diggins again *made* threats. The State was introducing the prior threats to prove motive and intent, which was disputed at trial. Amongst the many messages Diggins sent in May 2021, he also said he wanted to talk to M.D. To prove that Diggins actually had the intent to commit murder in the first degree when he took a substantial step, the State wanted to establish that his jealousy of M.D. was so great in 2015 that he made threats to kill, and when he suspected D.G. was with M.D. again in 2021, he was motivated to carry out his threat and intended to do so. Under the harmless error analysis, the record is sufficient for this court to determine that had the trial court considered the probative value versus the prejudicial effect, it would have found the probative value to outweigh the prejudicial effect and admitted the evidence. We hold the trial court erred in failing to conduct the balancing test on the record, but that the error was harmless.

Despite the fact that the trial court erred, we conclude the error was harmless for the additional reason that the result would have been the same even if the trial court had not admitted the 2015 threats. See Carleton, 82 Wn. App. at 686-87 (recognizing two ways to find harmless error when a trial court fails to conduct the ER 404(b) balancing test on the record). Though Diggins' messaging in May 2021 stated he wanted to kill and "talk" to M.D., the jury is left to determine the credibility of these

11

statements. Even without consideration of the 2015 threats, undisputed evidence established that Diggins followed through with his threat to drive to M.D.'s house with a loaded gun after he threatened to shoot and kill M.D.

*B. Jail Call*

Diggins next argues, under CrR 8.3(b), that the attempted murder charge should be reversed and remanded for a new trial because the trial court erred in denying his motion to exclude the jail calls. Before opening statements in the third trial, Diggins made an oral motion that the State committed a discovery violation by not disclosing Diggins' jail calls until after the second trial and that it was prosecutorial mismanagement in how the State investigated its case. Diggins did not argue how he was prejudiced because of the alleged mismanagement.

The jail call was discovered by a detective after he recognized Diggins' daughter's phone number in a call from another inmate's PIN number. After further exploration of this PIN number, the detective found a call placed to Diggins' daughter using this PIN number on August 11, 2021. In the call, Diggins can be heard stating that he intended to kill M.D. and himself but got "cold feet" once he arrived to M.D.'s home because Diggins did not want to kill himself. The State proffered to the court that the detective had found the call at some point in late May and it was turned over to the defense on July 6, approximately one month before the third trial began on August 4. The trial court found that the disclosure of the jail call one month before trial did not "necessarily rise[] to prosecutorial mismanagement."

The State has a continuing duty to promptly disclose discoverable information. CrR 4.7(h)(2); State v. Brush, 32 Wn. App. 445, 455, 648 P.2d 897 (1982). But Diggins

did not move to exclude the jail calls as a discovery violation. He instead moved to exclude under CrR 8.3(b). But CrR 8.3(b) provides that the "court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial. The court shall set forth its reasons in a written order." The trial court's power to *dismiss* a case under CrR 8.3 is discretionary and is reviewed for abuse of discretion. State v. Krenik, 156 Wn. App. 314, 320, 231 P.3d 252 (2010) (citing State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993)). Dismissal is an extraordinary remedy that should be used only as a last resort. Id. (citing State v. Wilson, 149 Wn.2d 1, 12, 65 P.3d 657 (2003)). This remedy is "generally available only when the defendant has been prejudiced by the prosecutor's actions." Id. (citing State v. Cannon, 130 Wn.2d 313, 328, 922 P.2d 1293 (1996)). A defendant must show actual prejudice to justify dismissal under CrR 8.3(b), the mere possibility of prejudice is insufficient. Id. (citing State v. Stein, 140 Wn. App. 43, 56, 165 P.3d 16 (2007)).

We need not review whether the trial court properly denied Diggins' CrR 8.3(b) motion because Diggins did not move to dismiss. He did not argue below or on appeal a basis to exclude the jail calls other than for prosecutorial mismanagement under CrR 8.3(b). Moreover, he fails to present any argument as to how he was actually prejudiced by the disclosure of the jail calls a month prior to the third trial. We decline to review Diggins claim that the court erred in declining to exclude the jail calls. RAP 10.3(a)(6) (appellate brief should contain argument supporting issues presented for review, citations to legal authority, and references to relevant parts of the record).

Ineffective Assistance of Counsel

Diggins asserts that counsel at his August 2022 trial was ineffective for failing to request a limiting instruction on the evidence of Diggins' previous threats to kill M.D.

To show ineffective assistance of counsel, Diggins must establish that his counsel's performance was both deficient and resulted in prejudice. State v. Grier, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011); Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In evaluating claims of ineffective assistance, courts must be highly deferential to counsel's decisions, a strategic or tactical decision is not a basis for finding error. Strickland, 466 U.S. at 689-91. There is a strong presumption of effective representation and the defendant bears the burden of showing the absence of legitimate strategic or tactical reason not to propose a proper limiting instruction. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Washington courts have long held that failure to request a limiting instruction can be a tactical decision. See State v. Price, 126 Wn. App. 617, 649, 27 (2005), overruled on other grounds by State v. Hampton, 184 Wn.2d 656, 665, 361 P.3d 734 (2015).; State v. Donald, 68 Wn. App. 543, 551, 844 P.2d 447 (1993); State v. Barragan, 102 Wn. App. 754, 762, P.2d 942 (2000).

Here, the record supports that the failure to request a limiting instruction was a strategic choice made by defense counsel. At trial, Diggins' theory of the case was that he had sent threats in the past and did not mean it and his intent in May 2021 was no different. This theme was central in the defense opening statement, questioning of their only witness, D.G., and closing argument. In opening, the defense argued that Diggins was "grasping for any form of contact" from D.G. and had used threats to kill himself, his

daughter, and M.D. in the past and been "rewarded" in the past by getting D.G. to contact him after making such threats. The defense elicited testimony from D.G. that Diggins' attempts to contact her to rekindle their relationship were "common" and that she told him she was turning off her phone when she received the messages on May 6 because she knew where they were headed. In closing, the defense argued that Diggins' threats had not been serious and were instead meant to worry D.G. so that she would contact him, comparing it to "bluffing" by a person gambling in a casino.

A limiting instruction would have limited the jury's consideration of the past threats to show motive or intent to commit murder in the first degree by establishing Diggins' jealousy. It would have prevented Diggins from using the evidence for another purpose. At first blush, it may appear that Diggins was simply arguing whether the evidence supported intent. However, Diggins' argument was actually based on propensity. Diggins did not argue that he was not jealous of M.D. Instead, Diggins argued that Diggins is the type of person who makes false threats to get D.G.'s attention and his conduct in May 2021 was in conformity with the same type of behavior in 2015.

We conclude that Diggins has not met his burden of showing the absence of a legitimate strategic or tactical reason for not requesting a limiting instruction. We need not address the prejudice prong.

<u>Sufficiency of the Evidence</u>

Evidence is sufficient to support a conviction if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements of the charged crime beyond a reasonable doubt. <u>State v. Scanlan</u>, 193 Wn.2d 753, 770, 445 P.3d 960 (2019). In challenging the sufficiency of the evidence, the defendant admits

15

the truth of the State's evidence and all reasonable inferences drawn from that evidence. State v. Trey M., 186 Wn.2d 884, 905, 383 P.3d 474 (2016).

"'Credibility determinations are for the trier of fact' and are not subject to review." State v. Cardenas-Flores, 189 Wn.2d 243, 266, 401 P.3d 19 (2017) (quoting State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990)). Because the jury "observed the witnesses testify firsthand, we defer to the jury's resolution of conflicting testimony, evaluation of witness credibility, and decisions regarding the persuasiveness and the appropriate weight to be given the evidence." State v. McCreven, 170 Wn. App. 444, 477, 284 P.3d 793 (2012). "If a reviewing court finds insufficient evidence to prove an element of a crime, reversal is required." State v. Smith, 155 Wn.2d 496, 505, 120 P.3d 559 (2005).

*A. Substantial Step*

Diggins argues that the evidence presented at his August 2022 trial was insufficient to prove that he took a "substantial step" beyond "mere preparation" to commit attempted murder in the first degree.

To be found guilty of an attempt to commit a crime, the defendant must take a substantial step toward the commission of that crime. RCW 9A.28.020(1). A person's conduct constitutes a substantial step if it is "strongly corroborative of the actor's criminal purpose." State v. Townsend, 147 Wn.2d 666, 679, 57 P.3d 255 (2002) (citing State v. Aumick, 126 Wn.2d 443, 427, 894 P.2d 1325 (1995)). "Mere preparation to commit a crime is not a substantial step." Id. (citing State v. Workman, 90 Wn.2d 443, 449-50, 584 P.2d 382 (1978)). However, "any act done in furtherance of the crime constitutes an attempt if it clearly shows the design of the defendant to commit the

16

crime." State v. Wilson, 158 Wn. App. 305, 317, 242 P.3d 19 (2010) (citing State v. Nicholson, 77 Wn.2d 415, 420, 463 P.2d 633 (1969)). Whether conduct constitutes a substantial step is a question of fact. State v. Billups, 62 Wn. App. 122, 126, 813 P.2d 149 (1991).

In this case, we conclude that the evidence was sufficient for the jury to determine that Diggins took a substantial step toward committing murder in the first degree. Diggins sent a series of messages to D.G. and his daughter between May 6 and May 7 stating his intent to travel to M.D.'s home and shoot him with the intent to kill him. Diggins stated in these messages "I'm going to take that fuck out with me," "I'm going to kill him," "this man is going to die," "once I see him I won't be able to not shoot." In voicemails Diggins left for D.G., he stated "I will go kill that bastard, I'm not exaggerating at all," and "I'm probably going to go up there and probably fucking shoot that guy in the head."

On May 7, D.G. received a message from Diggins including M.D.'s address stating he was "taking off now" and "I'll se [sic] ya or [M.D.] in 45" with an emoji depicting a face blowing a kiss. A few hours later, Diggins sent a photo from an intersection a "couple of hundred feet" from M.D.'s home. Diggins messaged "I'm on the street going to go talk to him."

The jury also heard a recorded jail call Diggins made to his daughter in which he stated that he had intended to kill both M.D. and himself at the time he drove to M.D.'s home. In the call, Diggins stated "the threats that I had made over those three days, and going back for years, never involved only [M.D.] and they always involved me killing myself." Diggins stated that he got "cold feet" after arriving to M.D.'s home because he

did not want to kill himself. The jury then learned that Diggins drove to M.D.'s neighborhood and sent a photo showing that he was at an intersection.

After a sheriff's deputy approached Diggins at the intersection and ordered him to show his hand, the deputy observed Diggins raise his left hand, but keep his right hand in the driver's compartment of the car where the deputy could not see it, but could see Diggins' right shoulder moving. Diggins' finally complied with the order to show both hands after approximately 15 seconds. After Diggins' exited the car, the deputy found a handgun on the floorboard under the front passenger seat and in the center console found a holster containing a magazine loaded with nine 9mm bullets and another magazine loaded with ten 9mm bullets in a Velcro pouch attached to the front of the holster. The defendant told the deputy he had removed the magazine after parking on that street. A deputy testified that with this type of gun, a person could press the release button while holding the handle of the gun and the magazine would drop straight out of the gun.

This court has previously held that evidence was sufficient to support a substantial step where a defendant made plans via email to meet with a 13-year-old girl in a specific parking lot at a specific time and pay her $300 to perform sex acts on him and was subsequently found in that parking lot at that time with $300 in cash on his person. Wilson, 158 Wn. App. at 316. Similarly, Diggins was found parked near M.D.'s home with a gun and loaded magazine. And this was after he said to others that he wanted to kill M.D., that he would drive to his house and that he would shoot him.

We conclude that sufficient evidence supports the jury's determination that Diggins took a substantial step toward the commission of murder in the first degree.

18

*B. Felony Harassment*

Diggins argues that the State failed to prove that M.D. was in reasonable fear that Diggins would carry out his threat to kill M.D. Diggins argues that because M.D. didn't leave work immediately upon learning of the threat and "never" testified that he was in fear Diggins would carry out the threat, the conviction should be reversed.

A person is guilty of harassment under RCW 9A.46.020 if, "without lawful authority" they knowingly threaten to "cause bodily injury immediately or in the future to the person threatened or to any other person," and that threat places "the person threatened in reasonable fear that the threat will be carried out." Former RCW 9A.46.020(1)(a)(i), (b) (2011). Harassment becomes felony harassment if it involves "threatening to kill the person threatened or any other person." Former RCW 9A.46.020(2)(b)(ii) (2011). A threat "means to communicate, directly or indirectly[,] the intent" to "cause bodily injury in the future to the person threatened or to any other person." RCW 9A.04.110(28)(a). A victim must subjectively fear that the threat made against them will be carried out. Trey M., 186 Wn.2d at 905; State v. E.J.Y., 113 Wn. App. 940, 953, 55 P.3d 673 (2002).

The record reflects that the State provided sufficient evidence to prove that M.D. was placed in reasonable fear as the result of Diggins' threats. After D.G. notified M.D. of the threats made, including that Diggins would "take that fuck out with me," "I'm going to kill him," and that Diggins was "in woodland and I'm not stopping," accompanied by a photo of a loaded gun in the center console of his vehicle, M.D. stated that he told D.G. to call the police and called the police himself when she did not. M.D. explained that he believed that Diggins was coming to his house based on the messages and was

concerned for both himself and D.G.  M.D. explained that he was fearful Diggins would carry out the threat.  After returning home that night, M.D. kept a loaded handgun near him while he slept.

After receiving the additional messages containing M.D.'s home address, which he previously believed Diggins did not know, he called police again, placed his handgun in a holster on his hip, loaded a rifle and remained in a bedroom with a view of the street and driveway in front of his house until police arrived.  M.D. testified that he was concerned because he did not believe that Diggins knew his address before receiving that message.  M.D. stated "receiving these threats and knowing that he knows where I live is, you know, disconcerting."

M.D. testified that upon learning that Diggins sent a photo of an intersection near his home to D.G., he was "very" concerned.  M.D. also explained that he did not believe Diggins' messages that he only wanted to speak to M.D., testifying "I had no reason to believe that he had changed his mind about killing me" in the time since Diggins had initially threatened him just hours earlier.

We conclude that there was sufficient evidence that M.D. had a reasonable fear that Diggins would act on his threat to support the conviction for felony harassment.

*C. Firearm Enhancement*

Diggins contends that there was insufficient evidence of the "nexus" between the firearm and his conviction for cyberstalking.  Diggins explains that he was charged with cyberstalking D.G., but the messages containing threats of a gun were not directed at D.G., but instead threatened to kill M.D.

"'Whether a person is armed is a mixed question of law and fact.' This court determines whether the facts are sufficient as a matter of law to prove that the defendant was armed by de novo review." State v. Sassen Van Elsloo, 191 Wn.2d 798, 825, 425 P.3d 807 (2018) (quoting State v. Schelin, 147 Wn.2d 562, 566, 55 P.3d 632 (2002) (plurality opinion)). Determining whether a defendant is armed for the purpose of a deadly weapon enhancement is a fact-specific decision. Van Elsloo, 191 Wn.2d at 825-26. To determine the sufficiency of evidence, we must establish whether any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt. Id. at 826. We must view the evidence in the light most favorable to the State and draw all inferences in its favor. Id.

A person is subject to a deadly weapon enhancement if armed with a firearm while committing a crime. RCW 9.94A.533(3). A person is "armed" if (1) a weapon is easily accessible and readily available for either offensive or defensive purposes during the commission of the crime, and (2) a nexus exists among the defendant, the weapon, and the crime. Sassen Van Elsloo, 191 Wn.2d at 826 (citing State v. Eckenrode, 159 Wn.2d 488, 493, 150 P.3d 1116 (2007)). The defendant is not required to be armed at the moment of arrest for the purpose of a firearm enhancement and the State need not prove the moment of accessibility with mathematical precision, so long as the firearm was readily available and easily accessible at the time of the crime. State v. O'Neal, 159 Wn.2d 500, 504-05, 150 P.3d 1121 (2007). Diggins only challenges the existence of a nexus. "Without this nexus, there is a risk that a defendant will be punished under the firearm enhancement for having a gun unrelated to the crime." Sassen Van Elsloo, 191 Wn.2d at 827. "To determine whether there was a nexus between the defendant,

21

the weapon, and the crime, the court looks at the nature of the crime, the type of weapon, and the circumstances under which it was found." Id.

A person is guilty of cyberstalking if, "with intent to harass, intimidate, torment, or embarrass any other person . . . makes an electronic communication to such other person or a third party" "threatening to inflict injury on the person or property of the person called or any member of his or her family or household."  Former RCW 9.61.260(1)(c) (2004).  The crime becomes a class C felony where "the perpetrator engages in the behavior prohibited under subsection (1)(c) of this section by threatening to kill the person threatened or any other person."  Former RCW 9.61.260(3)(b) (2004).

Sufficient evidence connected the firearm with Diggins' cyberstalking of D.G. Diggins sent a message to D.G. on May 6 stating "Well today's the day I'm not gonna go alone I am going to take that fuck out with me the one who destroyed my life and defiled my fucking beautiful wife I'm going to kill him and I will never forgive you."  D.G. understood the messages to be referencing M.D., her then-boyfriend whom she had lived with since earlier that year.  Following that message, Diggins sent another message stating "I'm in woodland And I'm not stopping you have no capacity to even imagine my passion and that I would truly die for love[.]"  Accompanying that message, Diggins sent a photo of a loaded handgun resting on the center console of his vehicle. The firearm was located in defendant's vehicle upon his arrest outside M.D.'s home the following day.  Diggins testified in the first trial that he sent messages to D.G. about harming M.D.  Diggins explained that he sent these messages with the intent to "shock [D.G.] and scare her, make her call [Diggins]."

Taking the evidence in the light most favorable to the State, there is sufficient

evidence to demonstrate that the firearm was easily accessible and readily available, and that there was a nexus among Diggins, the firearm, and the commission of the crime of cyberstalking.

## Jury Instruction

Diggins argues that his convictions for felony harassment and cyberstalking are "constitutionally flawed and must be vacated" because the jury was not instructed that they were required to find that "Diggins engaged in subjectively reckless conduct" in order to convict him.

The First Amendment does not protect "true threats" of violence. Counterman v. Colorado, 600 U.S. 66, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023). "True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" Counterman, 600 U.S. at 74 (quoting Virginia v. Black, 538 U.S. 343, 359, 123 S. Ct. 1536 (2003)). Prior to Counterman, whether a statement constituted a true threat depended on what the statement conveyed to the listener, rather than the mental state of the speaker. Id.

Following Diggins' 2021 conviction for felony harassment based on his threats to kill M.D., the United States Supreme Court held in Counterman that the First Amendment requires "a subjective mental-state requirement shielding some true threats" from criminal liability because prohibitions "on speech have the potential to chill . . . speech outside their boundaries." Id. at 75. The court held that in order to prosecute a defendant for making a threat, the State is required to prove that the defendant made the threat recklessly. Id. at 69. "The State must show that the defendant consciously disregarded a substantial risk that [the] communications would

be viewed as threatening violence." Id. at 69. In effect, the State is required to demonstrate that the defendant was "aware 'that others could regard [the] statements as' threatening violence and '[delivered] them anyway.'" Id. at 79 (quoting Elonis v. United States, 575 U.S. 723, 746, 135 S. Ct. 2001 (2015) (Alito, J. concurring in part and dissenting in part)). Doing so entails "consciously [accepting] a substantial risk of inflicting serious harm." Id. at 80. The State need not prove that the defendant actually intended to carry out the threat. Id.

Generally, "an issue raised and argued for the first time in a reply brief is too late to warrant consideration." Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). In the instant case, Diggins' opening brief was filed on June 6, 2023, approximately three weeks before the United States Supreme Court issued its decision in Counterman on June 27, 2023. Because the State was able to address Counterman in its response brief, we address the merits of Diggins' argument. See State v. Calloway, No. 57226-5-II, slip op. at 16 (Wash. Ct. App. June 11, 2024), https://www.courts.wa.gov/opinions/pdf/D2%2057226-5-II%20Published%20Opinion.pdf (addressing a jury instruction argument based on Counterman, which was decided after trial but before defendant's appeal was final).

A jury instruction is erroneous if it does not properly inform the jury of the applicable law. See State v. Barnes, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005). The "omission of the constitutionally required mens rea from the jury instructions . . . is analogous to" the omission of an element of the crime from the instructions. State v. Schaler, 169 Wn.2d 274, 288, 236 P.3d 858 (2010). Such an omission is subject to constitutional harmless error review. Id.; Calloway, slip op. at 17. "An error is harmless

24

and not grounds for reversal if the appellate court is assured beyond a reasonable doubt that the jury would have reached the same verdict without the error." State v. Romero-Ochoa, 193 Wn.2d 341, 347, 440 P.3d 994 (2019).  An omission of this nature "may be harmless when it is clear that the omission did not contribute to the verdict," such as when "uncontroverted evidence" supports the omitted element.  Schaler, 169 Wn.2d at 288.  An "error is not harmless when the evidence and instructions leave it ambiguous as to whether the jury could have convicted on improper grounds."  Id.

The jury in Diggins' first trial was instructed "to be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk."  This instruction is erroneous under Counterman.  Counterman requires proof "that the defendant" – not just a reasonable person in their position – "consciously disregarded a substantial risk that [the] communications would be viewed as threatening violence."  600 U.S. 108.

However, any error in the instruction was harmless.

Diggins took the stand in his first trial at which he was convicted of both felony harassment and cyberstalking.  The following exchange took place with Diggins:

Q. And did you, at any point, have any intention of shooting or harming [M.D.]?

A. No.

Q. Did you ever convey any of that?  Any intentions of harming [M.D.] to him?

A. Not to [M.D.] directly, no.

Q. Did you send messages to [D.G.] about potentially harming [M.D.]?

A. Yes, I did, in –

Q. What was the motivation for you doing that?

A. To shock her and scare her, make her call me.

Diggins went on to explain that "they were fake threats. They were just for attention. They were a ploy to make [D.G.] feel bad that I was suicidal; that I was brokenhearted; and that, you know, because of her choice to be with [M.D.]. And it was – it was a very immature, childish, manipulative ploy to get her to call me and, you know –."

In this case, the defendant himself testified that, not only did he consciously disregard a substantial risk that the messages would be interpreted as threatening violence, he actually intended for D.G. and M.D. to interpret them as threatening violence because he believed it would make D.G. contact him. This evidence was uncontroverted and from the defendant's own testimony as to his thought process in making the threats and his understanding of how others would perceive them. We conclude that, despite any instructional error under Counterman, the error was harmless.

Prosecutorial Misconduct

Diggins argues that the prosecutor committed misconduct by arguing facts not in evidence, specifically referencing an unrelated case in which a man was charged with attempted murder after driving to the home of a United States Supreme Court Justice.

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). The effect of a prosecutor's conduct is viewed in "'the

context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" State v. Monday, 171 Wn.2d 667, 675, 275 P.3d 551 (2011) (quoting State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)). We first determine whether the prosecutor's conduct was improper. Emery, 174 Wn.2d at 759. If the conduct was improper, we then look to whether the prosecutor's improper conduct resulted in prejudice to the defendant. Id. at 760. Prejudice is established by showing a substantial likelihood that the prosecutor's conduct affected the verdict. Id. Where a defendant fails to object to the prosecutor's remarks at trial, he is "deemed to have waived any error, unless the prosecutor's conduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice." Id. at 760-61.

In closing argument, the prosecutor stated "just like recently, an individual drove to a Supreme Court Justice's house with a gun to shoot him."[6] This comment was made in the context of the State addressing what constituted a substantial step toward committing a crime. Diggins did not object.

A prosecutor is not permitted to appeal to the passion and prejudice of the jury through the use of inflammatory rhetoric. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). Though the State has wide latitude to argue reasonable inferences from the evidence, it is misconduct for a prosecutor to urge the jury to decide

---

[6] Approximately two months before Diggins' August 2022 trial, a man had been indicted on one count of attempt to assassinate a United States Supreme Court justice. The government alleged that the man traveled from California to the Justice's home in Maryland with a firearm and ammunition. Press Release, U.S. Att'y's Off. for Dist. of Md., California Man Facing Federal Indictment in Maryland for the Attempted Murder of a Supreme Court Justice (June 15, 2022), https://www.justice.gov/usao-md/pr/california-man-facing-federal-indictment-maryland-attempted-murder-supreme-court-justice.

27

a case based on evidence outside the record. State v. Teas, 10 Wn. App. 2d 111, 126, 447 P.3d 606 (2019) (citing State v. Pierce, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012)). Referencing someone charged with the same or similar crime in another unrelated case is not relevant and was improper.

However, because Diggins did not object to the comment at trial, we must determine whether the statement was so flagrant and ill-intentioned that any resulting prejudice could not be cured. Emery, 174 Wn.2d at 761-62.

The Washington Supreme Court has noted that prosecutorial misconduct found to be flagrant and ill-intentioned is "in a narrow set of cases where we were concerned about the jury drawing improper inferences from the evidence, such as those comments alluding to race or a defendant's membership in a particular group, or where the prosecutor otherwise comments on the evidence in an inflammatory manner." In re Pers. Restraint of Phelps, 190 Wn.2d 155, 170, 401 P.3d 1142 (2018). Even where a prosecutor in closing argument "likened [the defendant's] pocketknife to the weapon used in the terrorist attacks on September 11, 2001" this court held that, though the comment was improper, in the context of explaining the definition of a deadly weapon and because the 9/11 attacks were not a "central theme" of the prosecutor's closing argument, it was not so flagrant and ill-intentioned that resulting prejudice could not have been cured. Teas, 10 Wn. App. 2d at 126-27. Here, the comment was similarly a passing comment in an attempt to explain the definition of a substantial step and was not referenced again nor made a central theme in closing or rebuttal.

We conclude that Diggins waived this issue by failing to object because the challenged statement was not so flagrant and ill-intentioned that any resulting prejudice

could not be cured.

## Discretionary Fees

In supplemental briefing, Diggins argues that this court should remand for the trial court to strike the VPA and DNA collection fees from his judgment and sentence because he is indigent.  We agree.

In this case, Diggins was sentenced on August 9, 2022 and the court imposed the then mandatory $500 VPA and $100 DNA collection fees.  See Former RCW 7.68.035(1)(a) (2018) (VPA), Former RCW 43.43.7541 (2018) (DNA).  During the pendency of Diggins' appeal, the legislature amended both statutes, eliminating the ability to impose these fees on indigent defendants.  LAWS OF 2023, ch. 449, § 1 (adding language to RCW 7.68.035(4) that the court "shall not impose the [VPA] under this section if the court finds that the defendant, at the time of sentencing, is indigent"), § 4 (eliminating mandatory DNA collection fee from RCW 43.43.7541(2)).  The trial court found Diggins indigent as defined in RCW 10.101.010 (3)(a)-(c).  Amendments to the VPA and DNA statutes while a case is on direct appeal support remand to strike those fees when defendant is indigent.  State v. Ellis, 27 Wn. App. 2d 1, 17, 530 P.3d 1048, 1057 (2023).

We remand to the trial court to strike the $500 VPA and $100 DNA collection fee from Diggins' judgment and sentence.

## Statement of Additional Grounds

*A. Sufficiency*

In his statement of additional grounds (SAG), Diggins first challenges the sufficiency of the evidence supporting his intent to commit attempted murder in the first

degree.  Diggins argues that because he was "experiencing an emotional breakdown and was depressed" and "suicidal," his intent was to make threats for attention as "a cry for help."

In challenging the sufficiency of the evidence, the defendant admits the truth of the State's evidence and all reasonable inferences drawn from that evidence.  Trey M., 186 Wn.2d at 905.  "'Credibility determinations are for the trier of fact' and are not subject to review." Cardenas-Flores, 189 Wn.2d at 266.

The State presented evidence of Diggins intent to commit murder through several pieces of evidence.  In a message to his and D.G.'s daughter during a conversation occurring simultaneously to his string of threats, he wrote "I know your mom thinks I'm bluffing.  You think I'm bluffing?  This time I'm not."  Diggins also told D.G. directly that he was not bluffing.  In the recorded August 2021 jail call to his daughter, Diggins repeatedly stated that he intended to both commit suicide and to kill M.D. when he went to his house, stating

- "The threats that I made over those three days, and going back for years, never involved only [M.D.] and they always involved me killing myself.  I made countless claims that I was ready to kill myself."

- "I was addicted to meth.  [D.G.] did not love me.  Hannah and I were fighting.  I was losing tens of thousands of dollars gambling, and I thought I wanted to kill myself.  I added [M.D.] to the threats so that she would hopefully care and pick up her phone.  The threats always included murder-suicide, or suicide, but never murder alone.  I got cold feet and exited – and never exited the car, because I was not ready to die that day because of the only thing I had left, my four-year-old son."

- "There was no scenario that I was ever going to kill that man and not myself."

- "And the only thing that I have, the only reason I wasn't is because I wasn't going to kill myself.  And I didn't – every single message that I can remember sending was about me killing myself and him along the way."

Diggins appears to suggest that the jury should have interpreted the evidence as a "cry for help" because he was suicidal. However, just because someone is suicidal does not mean they cannot also intend to commit murder in the first degree. Evidence is sufficient to support a conviction if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements of the charged crime beyond a reasonable doubt. Scanlan, 193 Wn.2d at 770.

Viewed in the light most favorable to the State, a rational trier of fact could find the elements of the charged crime beyond a reasonable doubt. Diggins himself admits in the jail calls that he planned to kill M.D., but claims he got cold feet. We reject Diggins' assertion.

*B. Perjury*

Diggins argues that deputy Corey Parker committed perjury by giving different testimony in the first and third trials regarding how long it took Diggins to comply with his order to show his hands.

In the first trial, Parker stated Diggins raised his right hand "after a few seconds" following Parker's second order to show his hands. In the third trial, Parker testified that Diggins took about 15 seconds to show his right hand after raising his left. On cross examination, defense counsel elicited from Parker that after the second command, "there was about a 10 to 15 second delay where [Diggins] continued doing whatever it was he was doing with his right hand." Defense counsel asked "and you've testified at previous hearings that it took 10 seconds correct?" to which Parker responded "10 to 15 seconds is my recollection." Defense counsel impeached Parker using the report he

31

wrote following Diggins' arrest, which did not state a specific length of time it took Diggins to comply with Parker's second command to raise his hands.

A person commits perjury by making a materially false statement which the speaker knows to be false under oath in any official proceeding. RCW 9A.72.020. Diggins presents no evidence that Parker provided materially false statements in his testimony, despite the fact that he testified both that it took Diggins "a few seconds" and between "10 and 15 seconds" to raise his right hand after being ordered. Additionally, Parker was impeached on this matter during defense counsel's cross examination, so the jury was able to determine the credibility of his statements.

Diggins' perjury claim fails.

*C. Third Trial*

Diggins contends that the trial court pressured the jury to return a verdict before the end of the court's business hours after closing arguments concluded at approximately 4 p.m. on a Friday. He states that the trial court "urged the jury to reach a verdict by 5:00 PM or they would need to return on Monday."

There is no indication in the record that the trial court made any such comment to the jury. Following the State's rebuttal argument, the trial court instructed the jury that it was not permitted to communicate about the case with anyone outside of the other jurors in the deliberation room and not to seek information about the case on the internet or in communications with anyone outside of jury deliberations. The trial court then excused the jurors at 4:03 p.m. After the jury was excused, the court notified the parties that it did not intend to keep the jurors late at the court to finish deliberations that

night, but that the trial court had "availability for them to return Monday morning to deliberate, if necessary." The jury returned with a verdict at 5:57 p.m. that same day.

The record does not support Diggins' assertion that the trial court pressured the jurors about completing deliberations within a certain time frame.

*D. Ineffective Assistance of Counsel*

Diggins next argues that his counsel was ineffective for not calling his girlfriend, Hanna Ashoor, to testify in the third trial. Ashoor had testified briefly in the second trial. In the second trial Ashoor testified at that time that she was Diggins' girlfriend, they had been together for six years and had a five-year-old son. She also testified that she was aware of the incident that happened in May 2022 and agreed that Diggins drove to Washington to see his "ex" and that he was still "hung up over her." She also testified that the car Diggins drove was one she shared and used for her job as a landscaper, which is why her garden tools, including a shovel and pick axe, were found in the vehicle.

Diggins fails to present any argument that the decision was not a strategic tactic choice by his defense counsel. Diggins also does not allege how his counsel's decision to not call Ashoor as a witness was error and how it prejudiced him.

We consider issues raised in a statement of additional grounds only when it adequately informs the court of the nature of the alleged error. State v. Calvin, 176 Wn. App. 1, 26, 316 P.3d 496 (2013) (citing State v. Alvarado, 164 Wn.2d 556, 569, 192 P.3d 345 (2008)). While the record supports that counsel elected to not call Ashoor to testify during the third trial, Diggins has failed to articulate why that was error.[7]

---

[7] Diggins' remaining claims in his statement of additional grounds either do not inform us of the nature of the alleged error to allow proper review, Calvin, 176 Wn. App. at 26, or relate to

33

CONCLUSION

We remand for the trial court to strike the VPA and DNA fees, but otherwise affirm.[8]

_Coburn, J._

WE CONCUR:

_Birk, J._     _Brunner, J._

---

facts outside of the record, which should be raised in a personal restraint petition. <u>McFarland</u>, 127 Wn.2d at 338 n.5; RAP 16.3.

[8] We do not reach Diggins' claim that he was improperly denied bail after his second mistrial on the charge of attempted murder in the first degree. He raised a similar claim, that this court rejected, when he was initially held. <u>See</u> <u>In re Pers. Restraint of Diggins</u>, No. 55987-1-II, slip op. (Wash. Ct. Jan. 19, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2055987-1-II%20Unpublished%20Opinion.pdf. Because Diggins is no longer being detained on a no-bail hold for a pending charge in this case, the matter is moot. "A case is moot if a court can no longer provide effective relief." <u>State v. Gentry</u>, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995).